UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| **CORY GREGORY,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| **v.** | **)** | **Case No. 21-cv-4039** |
| | **)** | |
| **GERALD BUSTOS, *et al.*,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Cory Gregory, proceeding *pro se*, filed an Amended Complaint under 42 U.S.C. § 1983 alleging that Defendants Sheriff Gerald Bustos, Jens Lape, Cory Ruark, Chris O'Melia, Nicholas Rollins, and Jacob Ward violated her constitutional rights at the Rock Island County Jail (RICJ). (Doc. 11).

This matter is before the Court on Defendants' Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1. (Docs. 60 and 63). For the reasons stated below, Defendants' Motions for Summary Judgment are GRANTED.

## MATERIAL FACTS

Plaintiff is a transgender female who has informally assumed the name "Harli Quinn." The Court will refer to Plaintiff using her legal name "Cory Gregory" to remain consistent with the caption of this case and the name under which this case was filed. The Court will use Plaintiff's preferred pronouns she/her/hers.

### *Plaintiff's Claims*

At merit review, the Court permitted Plaintiff to proceed on the following claims:

1. Defendant Rock Island County Sheriff Darren Hart violated Plaintiff's equal protection rights based on a policy and practice of placing transgender inmates in segregated confinement;

1

2. Defendant Hart violated Plaintiff's equal protection rights based on a policy and practice of allowing officers and inmates to sexually harass transgender inmates;

3. Defendant Hart violated Plaintiff's equal protection rights based on a failure to properly train staff to supervise transgender inmates;

4. Defendants Sheriff Gerald Bustos and Jens Lape violated Plaintiff's due process rights by placing her in segregation without a hearing;

5. Defendants Bustos, Lape, and Officer Jacob Ward failed to protect Plaintiff in violation of her Eighth Amendment rights;

6. Defendants Bustos and Lape violated Plaintiff's Eighth Amendment rights when they were deliberately indifferent to Plaintiff's serious mental health issues;

7. Defendant Hart violated Plaintiff's rights in his official capacity pursuant to the Americans with Disabilities Act (ADA) when he failed to reasonably accommodate Plaintiff's gender dysphoria; and

8. Defendants Bustos, Lape, and Officers Cory Ruark, Chris O'Melia, Nicholas Rollins, and Jacob Ward violated the state law tort of intentional infliction of emotional distress. (Doc. 10).

***Parties***

From November 16, 2020 through April 15, 2022, Plaintiff was incarcerated at the RICJ awaiting resentencing for a 2006 conviction.

Defendant Gerald Bustos is the former Sheriff of Rock Island, Illinois. Sheriff Bustos did not oversee the day-to-day operations of the RICJ, make decisions about housing assignments and inmate restrictions, or review inmate grievances/requests. On April 11, 2023, the current Rock Island County Sheriff Darren Hart was substituted for Sheriff Bustos on Plaintiff's claims against the Sheriff in his official capacity.

Defendant Captain Jens Lape is the Administrator of the RICJ and the official record keeper. At all relevant times, Defendants Chris O'Melia, Nicholas Rollins, Cory Ruark, and Jacob Ward were correctional officers at the RICJ.

2

*Murder of Adrianne Reynolds and Publicity*

In 2005-2006, Plaintiff was arrested, tried, and convicted of first-degree murder and concealment of a body after murdering her female classmate, Adrianne Reynolds, with a friend, Sarah Kolb, and concealing the body with Kolb and another friend.

During Plaintiff's trial and sentencing, she was housed at the RICJ for approximately eighteen months. She was initially housed in segregation because of her emotional state and was later housed both in male general population and segregation for disciplinary reasons and for suicide watch/prevention.

Plaintiff admitted that the crime was sensational and "dramatic," involving three minor offenders and a minor female victim, a strangling in the back of Kolb's car, and the subsequent dismemberment and burning of the victim's body before disposal in a local park. (Doc. 61-1 at pp. 15-16). At the time of the crime and criminal proceedings, the local and national press covered the story. Since 2006, there have been numerous podcasts, TV shows, and books, which covered the crime and involved interviews with Plaintiff. The victim's family has a Facebook page and holds annual vigils. During Plaintiff's resentencing proceedings in 2020-2022, the crime was further publicized in local newspapers and on TV, including the Quad City Times, Channel 6 KWQC, WQAD8 ABC, and Ourquadcities.com.

*Plaintiff's Transgender History*

Plaintiff, who is a transgender female, was diagnosed with gender dysphoria in May 2019 while in the custody of the Illinois Department of Corrections (IDOC) at Pontiac Correctional Center. She has been on hormone replacement therapy since March 2020. As of her deposition on July 25, 2022, Plaintiff has not had gender reassignment/confirming surgery; she is currently under

review by IDOC's transgender committee for a transfer to a women's facility and gender confirmation surgery.

Plaintiff testified that she hid her transgender status for fourteen years at the IDOC because other inmates "will either beat or stab" transgender individuals in general population. (Doc. 61-1 at p. 40). Plaintiff has been housed in male general population and male protective custody the entire time she has been incarcerated at IDOC, including just before and after her detainment at the RICJ.

### Plaintiff's Mental Illness

The IDOC has classified Plaintiff as "severely mentally ill" because of her bipolar diagnosis. During manic episodes, Plaintiff experiences delusions, excess energy, lack of sleep, and lack of concentration. Plaintiff has also been diagnosed with post-traumatic stress disorder, attempted suicide multiple times, and engaged in self-mutilation. When previously detained at the RICJ in 2005-2006, Plaintiff frequently needed to be placed on suicide watch.

### Threats From Other Inmates

While incarcerated in the IDOC, Plaintiff testified that she experienced an attempted rape by her cellmate. (Doc. 61-1 at p. 30). Plaintiff also testified that an interaction with another inmate at the RICJ caused her stress and triggered PTSD symptoms. *Id.* at pp. 31, 155. Plaintiff's requests and grievances to the RICJ staff indicated that she feared being harassed or sexually assaulted by other inmates.

### RICJ's Policy and Procedures for Housing Placement

The RICJ's written policies and procedures follow the guidance established under the Prison Rape Elimination Act (PREA). These written procedures require all inmates be assessed during intake, classification, and/or medical screening and upon a facility transfer for their risk of

4

being sexually abused by other inmates or sexually abusing other inmates. This screening takes place within seventy-two hours of the inmate's arrival and considers a series of factors, including but not limited to, disabilities, age, physical build, previous incarceration, criminal history, and whether the inmate is or is perceived as gay, lesbian, bisexual, transgender, or gender nonconforming, whether the inmate has previously experienced sexual victimization, the inmate's own perception of vulnerability, and whether the inmate is detained solely for civil immigration purposes.

The RICJ staff use the information obtained from the screening to determine housing, bed, work, education, and program assignments with the goal of separating inmates at high risk of being sexually victimized from those at high risk of being sexually abusive. Staff also consider facility and staffing needs, housing availability, and maintaining good order in the facility when making individualized determinations about where to house an inmate.

Transgender or intersex inmate's own views with respect to his/her/their own safety is given serious consideration but is not dispositive. When deciding whether to assign a transgender inmate to a section of the facility for male or female inmates, and in making other housing and programming assignments, jail staff consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems. Transgender inmates are given an opportunity to shower separately from other inmates.

Placement and programming assignments for transgender inmates are assessed at least twice a year to review any threats to safety experienced by the inmate. Plaintiff's housing placement was reviewed every thirty days to determine whether her housing was appropriate for

her health and safety, as well as whether her placement presented management or security problems.

Illinois County Jail Standards, 20 Ill. Admin. Code 701.70(5), requires convicted offenders to be separated from charged detainees. Plaintiff's convicted offender status further limited her housing options.

Defendant Lape made the final decision regarding Plaintiff's housing placement and placed her in protective custody. In making this decision, Defendant Lape considered Plaintiff's individual and unique criminal history, threats to her safety based on her crime and surrounding publicity, the likelihood of her being victimized by other inmates, the fears she voiced of being harassed or sexually assaulted by other inmates, her convicted felon status, the limitations of the physical facility and staffing, and maintaining order in the RICJ. Defendant Lape's decision rested heavily on the sensationalism and publicity surrounding Plaintiff's crime, which reappeared with her resentencing hearings. (Doc. 61-4, Lape Aff., ¶ 40).

Defendant Lape also considered the limited housing options due to COVID-19. Throughout the pandemic, the IDOC intermittently paused the intake of inmates during high transmission rates. The IDOC's refusal to accept inmates resulted in additional inmates remaining at the RICJ, causing overcrowding and limiting the number of available beds. Additionally, the need to quarantine inmates who had contracted the disease further limited housing options and created unexpected lockdowns.

According to Defendant Lape, another transwoman inmate, Joshua Bailey, entered the RICJ on May 17, 2021, and was released later the same day. (Doc. 61-4, Lape Aff., ¶ 28). Bailey was housed in an individual cell in booking after being verbally hostile towards staff, "tweeking," and requesting to be alone. Bailey was also detained at the Jail from October 6, 2021 to December

6

10, 2021, when she was transferred to another county to face charges there. She was initially on suicide watch after asking a correctional officer to "kill me now" and was then placed in a restraint chair when she refused to cooperate with the suicide watch procedure. Bailey later requested protective custody and was moved to segregation based on this request. Bailey did not wish to change her protective custody status during her detention at the Jail. To the best of Defendant Lape's knowledge, there have been no other transgender inmates at the Jail since he became Jail Administrator in August 2020.

Plaintiff maintains she was housed in protective custody based on her transgender status, as there were other murderers at the RICJ housed in general population. According to Defendant Lape, none of these individuals received as much press as Plaintiff. For example, Ward Davis was charged with fatally beating an older woman to death with a hammer in September 2021. Although there was some press about the crime, Ward's charge was not nearly as sensational and publicized as Plaintiff's crime. As a result, Ward was able to be housed in general population safely.

***Plaintiff's Detention at the Jail in 2020-2022***

Plaintiff was transferred to the RICJ on November 16, 2020, from the IDOC to await resentencing proceedings. When she arrived, she was initially housed in A-block for a COVID-19 quarantine. During the seven-day quarantine, Plaintiff was moved to medical watch per MEnD Correctional Care, the Jail's third-party medical provider.

On November 24, 2020, Plaintiff was assigned to protective custody and moved to the 4th Floor Detention, a segregation unit used for protective custody. Defendant Lape personally met with Plaintiff on December 2, 2020 and December 22, 2020, in regards to getting her phone time and law library access. On both occasions, Plaintiff did not complain of her housing assignment or otherwise. Defendant Lape continued to review Plaintiff's housing assignment every thirty days,

regularly meeting with her to explain the situation and to receive her input. Although Plaintiff asked to move to the general population, Defendant Lape determined it was safer for her to remain in protective custody based on the notoriety of her crime.

While in protective custody, Plaintiff was the only inmate housed in 4th Floor Detention. However, the shower is used by inmates housed in booking or medical watch for daily showers. After Plaintiff complained of an inmate masturbating outside her cell when the inmate was supposed to be showering, staff moved Plaintiff to the law library during shower times to ensure her safety. Starting in February 2021, Plaintiff refused to leave her cell while other inmates were showering and threatened to "fight" the correctional officers if they tried to move her. In addition, Plaintiff submitted an undated written note to Jail Lieutenant Bryan Browne informing him that she would no longer go to the law library and that it was fine to "run showers up here." As a result, staff stopped moving Plaintiff to the law library during shower time.

In late 2021, Plaintiff was transferred to K-pod, a segregation unit on the female floor. Like 4th Floor Detention, K-pod has two single-occupancy cells. During her stay in K-pod, Plaintiff was the only inmate assigned housing there.

During Plaintiff's incarceration at RICJ, there were two former law enforcement officers who were detained at RICJ. Although neither were transgender, both were housed in the K-pod and 4th Floor Detention. Kirk DeGreve entered the facility on April 15, 2021 and was released on July 12, 2021 after serving his sentence. He was housed in K-pod. Jerome Patrick entered the RICJ on March 1, 2022 to serve his sentence. Patrick was initially housed in 4th Floor Detention before being moved to K-pod after Plaintiff left the RICJ.

Plaintiff frequently complained of isolation due to her housing assignment. Defendant Lape regularly discussed the housing assignment with her and discussed her issues with the isolation.

8

As a result of their conversations, Defendant Lape moved Plaintiff to K-pod once DeGreve was released, and Plaintiff had unlimited access to the phone, kiosk, and shower. While being housed in K-pod, Plaintiff had access to the dayroom, kiosk, and phone all day. Plaintiff also preferred being housed in K-pod because the unit was overseen by female officers who Plaintiff testified "treated me more respectfully." To further alleviate her isolation, staff took additional steps to ensure that Plaintiff had contact with visitors, even during the pandemic and various COVID-19 lockdowns. Plaintiff regularly had visitors, including immediate and extended family members. Plaintiff remained housed away from male or female inmates for the remainder of her incarceration at the RICJ.

***Medical and Mental Healthcare at the Jail***

All medical care at the RICJ is provided by MEnD Correctional Care (MEnD), and all mental health services are provided by the Robert Young Center (RYC). Inmates can request medical and mental health care through the kiosk or inmate request forms, which are sent directly to MEnD or RYC for review. Alternatively, MEnD can make referrals to RYC on an inmate's behalf.

Plaintiff was screened by a booking officer when she entered the facility, and Nurse Paxton from MEnD reviewed her screening within a couple of hours. Plaintiff entered the RICJ with prescriptions for hormone replacement therapy and other medications, which were reviewed by MEnD before she was given the medications. Plaintiff admitted that her hormone replacement therapy was continued the day after she arrived. (Doc. 61-1, Gregory Dep., pp. 75-76). Although Plaintiff disputes that the medical treatment she received was appropriate (the dosages she was prescribed and MEnD's decision not to do regular bloodwork), she admits that the medical records provided by MEnD are accurate.

9

Plaintiff admits she voluntarily discontinued her psychiatric medications but claims she did so to receive mental health treatment. *Id*. at 26. Plaintiff did not request mental health care during her detention at the RICJ through requests or grievances. Instead, Plaintiff assumed that taking herself off her medications for her mental health conditions would automatically trigger a mental health exam. *Id*.

During Defendant Lape's conversations with Plaintiff, she complained of loneliness and not having someone to talk to. Lape requested staff at RYC to reach out to Plaintiff and see what they could do. The RYC worked directly with Plaintiff and provided her with mental health services starting in August 2021.

### *Masturbation Incident on November 29, 2020*

While housed in 4th Floor Detention, Plaintiff filed a grievance on November 29, 2020, complaining that inmates who were using the shower called her names, that one inmate masturbated outside her cell, and that a correctional officer looked through the observation window during the incident but did nothing.

Plaintiff's cell was L-shaped, with a door at the end of one of the legs and the toilet located in the other leg. From the cell door, the toilet was not visible, and anyone standing along the wall with the toilet would not be visible. Additionally, someone sitting or standing near the toilet would not be able to see the cell door. The cell door was steel with a rectangular window running perpendicular to the door starting at about chest height.

On the wall opposite the door, there was an observation window through which the officer at Post 6 could see into Plaintiff's cell. Officers from Post 5 or 6 checked on Plaintiff approximately once per hour through the observation window. The observation window is covered by a metal

door which must be opened before the officer can see the inmate's cell. The observation window cover could not be opened from inside the cell and was closed at the time of the incident.

On November 29, 2020, an inmate who was using the shower stripped naked and masturbated outside of Plaintiff's door. When the inmate began masturbating, Plaintiff was sitting on her bunk. She then went to the wall the door was on, and pressed her back against it, so that she could not see the inmate and the inmate could not see her. Plaintiff testified that the inmate shouted at her, saying derogatory things and threatening to rape her. The inmate did not refer to Plaintiff's transgender status, but he called her a "bitch." (Doc. 61-1, Gregory Dep., p. 100). Plaintiff only saw the inmate masturbating when he first started before she moved from her bunk. The inmate remained on the opposite side of the steel door, never entered Plaintiff's cell, and there was no physical contact between Plaintiff and the inmate. *Id*. at pp. 89, 107-108. Plaintiff estimated that the incident lasted twenty minutes. *Id*. at pp. 105-06. Plaintiff testified that she froze up and yelled for the officers, saying "C.O., C.O.!" *Id*. at p. 103. Plaintiff did not receive a response from any officer and there was no indication that any officer heard her. *Id*. at p. 104.

At one point, Defendant Ward opened the observation window to check on Plaintiff, and she pointed at the cell door. Plaintiff admitted that when Defendant Ward looked through the observation window, he would not have seen the offender's penis or actions, but would have been able to see "like, shoulder movement a little bit." *Id*. at pp. 175-176. Plaintiff admitted that she did not say anything to or request assistance from Defendant Ward when he opened the observation window and checked on her. Plaintiff does not know whether Ward heard the inmate yelling or threatening her. *Id*. at p. 107.

11

After she grieved the incident, Plaintiff admitted that such incidents never occurred again. During her deposition, Plaintiff clarified that she uses the term "sexual assault" and "sexually assaulted" to refer to the masturbation incident on November 29, 2020.

### Plaintiff's Alleged Mistreatment by Staff

On November 20, 2020, Plaintiff testified that Defendant Officer Ruark overheard her speaking to a nurse about her medications and interrupted to advise her that she would receive no special treatment, would be treated like all the other male inmates, and called Plaintiff mentally ill. Plaintiff acknowledged that, after grieving about Defendant Ruark's comments, she did not have any issue with Ruark repeating the comments again. Defendant Lape responded to Plaintiff's grievance by informing her that shift command had been informed.

Plaintiff testified that, on November 23, 2020, Defendant Officer O'Melia called her derogatory names, threatened to "strip out" Plaintiff, and deny her food. Plaintiff admitted that none of these threats were realized. (Doc. 61-1, Gregory Dep., pp. 123-126; Doc. 61-5, Browne Aff., ¶ 11). Plaintiff testified that Defendant O'Melia called her "faggot" or "he-she" or hit her cell door each time he did his rounds. Jail staff investigated Plaintiff's complaints against O'Melia but found no substantiating evidence of the complaints. (Doc. 61-4, Lape Aff., ¶ 48; Doc. 61-5, Browne Aff., ¶11). Plaintiff admitted that Defendant O'Melia never repeated his comments. (Doc. 61-1, Gregory Dep., p. 126).

Plaintiff testified that, on December 9, 2020, Defendant Officer Rollins told her that she was not permitted a nightly shower, but she could have a shower if she would "suck his dick." After Plaintiff submitted a grievance about Defendant Rollins' comments, jail administration investigated the allegations and found no corroborating evidence. (Doc. 61-1, Gregory Dep., p.

127-128; Doc. 61-4, Lape Aff., ¶ 49). Plaintiff admitted that the alleged misconduct by Defendant Rollins was never repeated.

Plaintiff testified that Officer Cole, who is not named as a party, called her "Cory" and "Mr. Gregory" on August 31, 2021 and again in November 2021. Plaintiff called the PREA hotline and left a message complaining that Cole called her "Cory" and "Mr. Gregory" and intentionally misgendered her. (Doc. 61-1, Gregory Dep., pp. 111-112; Doc. 61-9, PREA Compl. Recording, RICO 1616). Lieutenant Christopher Young looked into the matter and instructed Cole to call Gregory "Harli" or by female pronouns. When she returned, Plaintiff did not have further issues with Cole. (Doc. 61-1, Gregory Dep., pp. 114-15; Doc. 61-4, Lape Aff., ¶¶ 46-47).

During her deposition, Plaintiff clarified that she uses the term "sexual harassment" to mean being misgendered or being called "Mr. Gregory" or "Cory" by correctional staff. Plaintiff complains that Officers Cole, Ruark, O'Melia, Ward, and Rollins "constantly misgendered" her and called her "Cory."

### ADA Violation Allegations

Plaintiff testified that her ADA claim arises from her gender dysphoria and the RICJ's refusal to accommodate her housing requests to be placed in female general population, or alternatively, male general population.

### Plaintiff's Response

Plaintiff does not respond to Defendants' Joint Statement of Undisputed Material Facts. While Plaintiff does provide a document entitled "Disputed Statement of Facts," she does not provide evidentiary support or citations to the record and attempts to supplement many of the facts with immaterial additional information or legal argument.

13

"The Seventh Circuit has repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment, even in the case of *pro se* plaintiffs." *Sokoya v. Downey*, No. 06-2219, 2009 WL 773523, at *3 (C.D. Ill. Mar. 20, 2009) (citing *Moralis v. Flageole*, No. 06 C 2034, 2007 WL 2893652, at *1 (C.D. Ill. Sept. 28, 2007); *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000)); *see also McNeil v. United States,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed, ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."). Additionally, this Court's Local Rules provides that "[a] failure to respond to any numbered fact will be deemed an admission of the fact." CDIL-LR 7.1(D)(2)(b)(6).

Given Plaintiff's failure to comply, the Court deems Defendants' statements of uncontested fact admitted. *See*, *e.g.*, *Poole v. United States GAO*, 1 F. App'x 508, 510 (7th Cir. 2001); *see also Sokoya*, 2009 WL 773523, at *3. However, to the extent Plaintiff asserts facts within her personal knowledge in her responses, the Court will consider those additional facts for the purposes of this Order. *See* Fed. R. Evid. 602.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must

construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## ANALYSIS

### I.   Plaintiff failed to demonstrate former Sheriff Bustos had sufficient personal involvement in the alleged constitutional deprivations.

As an initial matter, Defendants argue that Sheriff Bustos, in his individual capacity, is entitled to summary judgment because he was not personally involved in the alleged constitutional violations. "[Section] 1983 does not allow actions against individuals merely for their supervisory role of others." *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003) (internal quotations omitted). "[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quoting *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)).

In his Response, Plaintiff did not address this argument and has therefore conceded it. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Additionally, the undisputed facts show that Defendant Sheriff Bustos did not have sufficient involvement in Plaintiff's placement in segregation, treating her mental health conditions, or in failing to protect her. The Court finds that Sheriff Bustos is entitled to summary judgment on Plaintiff's § 1983 claims in his individual capacity.

## II.   Defendant Sheriff Hart is entitled to summary judgment on Plaintiff's equal protection claims.

Plaintiff alleges that Rock Island County Sheriff Darren Hart, in his official capacity, violated her right to equal protection based on (1) a policy and practice of placing transgender inmates in segregation; (2) a policy and practice of allowing officers and inmates to sexually harass transgender inmates; and (3) failing to properly train staff to supervise transgender inmates. Defendants argue that Plaintiff failed to provide any evidence to permit a reasonable inference that they intentionally discriminated against her because of her transgender status.

The Fourteenth Amendment provides equal protection to individuals harmed by state action based on race, sex, national origin, religion, political affiliation, suspect classification, because the person has exercised a "fundamental right," or are members of a group irrationally targeted for discrimination. *Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010). "The first task in equal-protection analysis is to identify the type of governmental classification at issue, which determines the level of scrutiny that applies." *West v. Radtke*, 48 F.4th 836, 851 (7th Cir. 2022) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985)).

"Neither the Seventh Circuit nor the Supreme Court has determined whether transgender individuals constitute a protected class." *Tay v. Dennison*, 457 F. Supp. 3d 657, 680 (S.D. Ill. 2020). Other district courts outside the Seventh Circuit have recognized transgender individuals as either a suspect or quasi-suspect class entitled to heightened scrutiny. *Id.* (citing *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (concluding that heightened scrutiny applied to equal protection claim arising from a transgender girl being denied access to the girls' bathroom because transgender individuals are a quasi-suspect class).

16

In *West v. Radtke*, the Seventh Circuit applied an intermediate scrutiny test to discuss the equal protection rights of a transgender correctional officer. *West*, 48 F.4th at 852; *see also Tay*, 457 F. Supp. 3d at 680 (applying the same standard to transgender inmate claims). "Under intermediate scrutiny, 'classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives' in order to be upheld." *Id.* (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)). "[T]he burden is on the state to demonstrate that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *West*, 48 F.4th at 852 (internal quotations omitted).

Under this standard, Plaintiff must show that: "(1) she has been intentionally treated differently from others who are similarly situated; and (2) there is a substantial relationship between this difference and a sufficiently important government interest." *Mitchell v. Price*, No. 11-cv-260, 2014 WL 6982280, at *8 (W.D. Wisc. 2014) (citing *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2012) (collecting cases and holding that heightened scrutiny applies to transgendered plaintiff's equal protection claims)). "A showing that the defendants were negligent will not suffice." *Nabozny v. Podlesny*, 92 F.3d 446, 453-54 (7th Cir. 1996). Plaintiff must show that Defendants "acted either intentionally or with deliberate indifference" toward her because of her transgender status. *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002) (quoting *Nabozny*, 92 F.3d at 454).

## A. Housing

While Plaintiff awaited her resentencing hearing, she was housed alone in K-pod and the 4th Floor Detention. Plaintiff claims she was housed in protective custody based solely on her transgender status.

According to Defendant Lape, his decision to place Plaintiff in protective custody was based upon many factors, including her unique criminal history, the potential threats to her safety based on her crime and the publicity, the likelihood of her being victimized by other inmates, her voiced fears of being harassed or sexually assaulted by other inmates, her convicted felon status, maintaining order in the Jail, and the physical and staffing limitations of the facility, especially during the COVID-19 pandemic.

It is undisputed that Plaintiff's detention coincided with the COVID-19 pandemic. During 2020 and 2021, the IDOC restricted the intake of inmates to avoid spreading the disease. Inmates who would have been transferred remained at the RICJ, which caused overcrowding and further limited inmate movement and housing options. Additionally, any positive case required quarantines and lockdowns, exasperating the housing shortage.

The evidence shows that Defendant Lape attempted to minimize the drawbacks of being housed in protective custody. For instance, he reviewed Plaintiff's housing every thirty days, regularly met with her, and received input from Plaintiff. Defendant Lape allowed Plaintiff to interact with others and ensured she had access to regular visits, even during COVID lockdowns. Defendant Lape also moved Plaintiff to a newer cell block with a phone and kiosk for video calls to help alleviate loneliness.

In her Response, Plaintiff argues that her placement in male general population in 2005-2006 undermines Defendant Lape's decision to place her in protective custody in 2020-2022. However, when Plaintiff returned to the RICJ in 2020, Defendant Lape was concerned that she was be victimized in the male general population. He was also concerned about her safety in the female general population because of her criminal conviction and the publicity surrounding the particularly heinous crime. Coupled with the limited housing and staffing during the pandemic,

18

the Court finds that Defendant Lape made a reasonable and rational decision to house Plaintiff in protective custody.

There is no evidence that other, non-transgendered prisoners were treated more favorably. Although Plaintiff argues that Ward Davis, who was charged with fatally beating an older woman to death with a hammer in September 2021, was housed safely in the general population, Plaintiff and Davis are not similarly situated, as Davis' crime was not as sensational and widely publicized as Plaintiff's crime. Kirk DeGreve and Jerome Patrick are more reasonable comparators. Although neither are transgender, both were housed alone in K-pod and/or the 4th Floor Detention for their own safety because they faced a high risk of violence. Thus, like Plaintiff, they were placed in protective custody for the duration of their detentions.

Plaintiff has failed to present any evidence that Defendants intentionally or deliberately discriminated against her by subjecting her to isolation based on her gender identity or refusing to transfer her to a women's unit or the general population. *See Nabozny*, 92 F.3d at 453-54.

### B. Harassment and training

Plaintiff claims she was harassed by the RICJ staff and that staff were not trained how to treat transgender inmates. It is undisputed that any alleged harassment by Defendants or other staff was strictly verbal. Defendant Officer Ruark allegedly told Plaintiff that she would not receive special treatment and would be treated like other inmates. Defendant Officer O'Melia allegedly called Plaintiff a "faggot" or "he-she," hit her cell door during rounds, and threatened to strip her out and deny her of food, but he never did so. Plaintiff claims that Defendant Officer Rollins allegedly told her that she was not permitted a nightly shower, but she could shower if she would "suck his dick." Despite the threat, Plaintiff was able to shower without a problem. Finally, Plaintiff complains that Officer Cole, who is not named as a Defendant, called her "Cory" and

"Mr. Gregory" on two occasions, which Plaintiff claims was "sexual harassment." In fact, she called the PREA hotline to report the misgendering.

These allegations–even assuming for purposes of summary judgment that they are true–are simply insufficient to raise a constitutional question. *Mitchell*, 2014 WL 6982280, at *10. "[T]he Constitution does not compel guards to address prisoners in a civil tone using polite language," *Antoine v. Uchtman*, 275 F. App'x 539, 541 (7th Cir. 2008), and "[s]tanding alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (holding that "[t]he use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution"); *see also Bell v. Duperrault*, 367 F.3d 703, 709 (7th Cir. 2004) ("downright rudeness" not sufficient to support "class of one" equal protection claim).

The most egregious incident occurred on November 29, 2020, when a male inmate allegedly masturbated outside her cell door while threatening her; however, Plaintiff admitted there was a metal door between her and the inmate; the inmate never entered her cell; there was no physical contact; and the inmate could not see Plaintiff after she moved away from the door. Plaintiff argues that Defendant Ward failed to protect her during this incident, but she admits that she did not request assistance from Defendant Ward and did not know if he saw the male inmate's actions or heard the threats and derogatory language.

It is undisputed that after RICJ officials were informed of the incident, they took immediate action and arranged for Plaintiff to be moved to the law library while other inmates used the shower. This continued until Plaintiff refused to leave her cell while other inmates were showering and threatened to "fight" the correctional officers if they tried to move her. The lack of

20

reoccurrence of this incident and the undisputed evidence that supervisory staff addressed issues after they were made aware of them belies Plaintiff's claim that staff were untrained about the issues transgender inmates may face. Therefore, Defendant Sheriff Hart is entitled to summary judgment on Plaintiff's equal protection claims.

### III.   Defendants Bustos and Lape are entitled to summary judgment on Plaintiff's procedural due process claim.

Plaintiff alleges Defendants Bustos and Lape violated her procedural due process rights under the Fourteenth Amendment by placing her in segregation without a hearing. Defendants argue Plaintiff did not have a right to a hearing because her placement in protective custody was not punitive and the conditions did not pose an atypical or significant hardship.

The review of a procedural due process claim requires a two-part analysis: whether the plaintiff was deprived of a protected liberty or property interest, and if so, what process was due. *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996). In other words, if a constitutional right is identified, then procedural due process must be provided. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1020 (7th Cir. 2000). A due process violation may be implicated if "the defendants deprived [plaintiff] of a liberty interest by imposing an 'atypical and significant hardship on [plaintiff] in relation to the ordinary incidents of prison life." *McCoy v. Atherton*, 818 F. App'x 538, 541 (7th Cir. 2020) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Court must examine not just the severity, but the duration of the complained-of conditions. *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997).

Here, Plaintiff's initial placement in A-pod and medical watch was for COVID-19 quarantine, and her later placement in segregation was for protective custody. Based on the undisputed material facts, the Court finds that Plaintiff's placement in protective custody was not punitive. Plaintiff argues she experienced an atypical and significant hardship by her placement in

protective custody; however, she has not presented any admissible evidence that the conditions of confinement were different than the typical conditions in jails and prisons. *See Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir. 1995) (holding that the conditions did not greatly exceed what a prison inmate could expect from confinement generally). The undisputed facts show that she had regular contact with staff and visitors, was allowed to leave her cell to go to the library, gym, and dayroom, had access to regular phone calls, and watched television, as evidenced by her grievances complaining about the programming. There is no evidence that the conditions of Plaintiff's confinement created an atypical or significant hardship. *See Williams v. Brown*, 849 F. App'x 154, 156 (7th Cir. 2021) (only lengthy period of segregation and harsh conditions will violate due process); *Lekas v. Briley*, 405 F.3d 610, 613 (7th Cir. 2005) (90 days in segregation with loss of contact visits, loss of telephone and commissary privileges, and the inability to participate in programs did not implicate protected liberty interests). Therefore, Defendants Bustos and Lape are entitled to summary judgment on Plaintiff's procedural due process claim.

## IV. Defendants Bustos, Lape, and Ward did not violate Plaintiff's Eighth Amendment rights by failing to protect her.

Plaintiff alleges that Defendants Bustos, Lape, and Ward failed to protect Plaintiff in violation of her Eighth Amendment rights. Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 831-33 (1994). Officials violate the Eighth Amendment's prohibition of cruel and unusual punishment only if they are deliberately indifferent to a prisoner's welfare, effectively condoning the attack by allowing it to happen. *Haley v. Gross*, 86 F.3d 630, 640 (7th Cir. 1996). Plaintiff must demonstrate that "prison officials were aware of a specific, impending, and substantial threat to her safety." *Tay v. Dennison*, 457 F.Supp.3d 657, 684 (S.D. Ill. 2020) (quoting *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996)). It is not enough that a reasonable prison official would or should have known that the prisoner was

at risk; the official must actually know of and disregard the risk to incur culpability. *Farmer*, 511 U.S. at 837-38; *Lewis v. Richards*, 107 F.3d 549, 552-53 (7th Cir. 1997).

Demonstrating deliberate indifference towards a prisoner's safety requires a showing that the inmate was incarcerated under conditions posing a substantial risk of serious harm, and a showing that individual prison officials had subjective knowledge of the risk of harm, which they personally disregarded. *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). The prison officials must have a sufficiently culpable state of mind—one of deliberate indifference to inmate health or safety. *Id.* at 778. Deliberate indifference requires that the corrections officer must have actual knowledge of the risk. *Id.* at 776. As to the second prong, the question is not whether individual officers should have known about risks to an inmate's safety, but rather whether they did know of such risks. *Id.* at 775. "Mere negligence (for example if a prison guard should know of a risk but does not) is not enough to state a claim for deliberate indifference under the Eighth Amendment." *Pope*, 86 F.3d at 92. Liability for failure to protect an inmate materializes only if the officer knew the inmate faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Grieveson*, 538 F.3d at 777.

## A. Defendants Bustos and Lape

Plaintiff testified that her failure-to-protect claim against Defendants Bustos and Lape stems from their refusal to house her in general population. (Doc. 61-1 at 53-54). Defendants Bustos and Lape argue that Plaintiff has not identified a cognizable failure to protect claim.

The undisputed facts demonstrate that Defendant Lape was concerned about Plaintiff's safety and tried to protect her by placing her in protective custody to separate her from other inmates who might harm her. (Doc. 61-4, Lape Aff., ¶ 25). Defendant Lape tried to help Plaintiff when she complained about feeling isolated. For instance, Lape moved Plaintiff to the K-pod unit

where she had unlimited access to the phone, kiosk, and shower. *Id*. at ¶ 37. He also ensured she had contact with visitors, even during the COVID-19 pandemic and lockdowns. *Id*. at ¶ 38.

There is no evidence that Plaintiff experienced any physical assault or violence by inmates or staff. The verbal harassment Plaintiff alleges she experienced "does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000).

Regarding the masturbation incident on November 29, 2020, the undisputed facts demonstrate that Plaintiff was on the other side of the cell door and out of sight of the inmate. There was no physical contact between Plaintiff and the inmate. Plaintiff complains that Defendants Lape and Bustos failed to protect her because no criminal investigation was done after the incident, but Plaintiff cites to no authority for this position. Defendants have no obligation to conduct a criminal investigation. *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (no constitutional right to a thorough investigation). "[A]n allegation of inadequate investigation does not state a violation of a plaintiff's civil rights." *Ford v. Page*, 169 F. Supp. 2d 831, 840–41 (N.D. Ill. 2001). When staff attempted to protect her by moving her to the library during shower time, she rejected their efforts and threatened to fight anyone who moved her.

No reasonable jury would find that Defendants failed to protect Plaintiff. There is no evidence that placing Plaintiff in protective custody rather than in the general population posed a substantial risk of serious harm to her or that Defendants acted with deliberate indifference to that risk. Therefore, Defendants Lape and Bustos are entitled to summary judgment on Plaintiff's failure to protect claim.

### B. Defendant Ward

Plaintiff alleges that on November 29, 2020, a male "inmate sexually assaulted Plaintiff by standing naked at her cell door and masturbating for over 20 minutes, expressing the sexual things he wished to do to Plaintiff. At one point, Officer John Doe (later identified as Defendant Ward), witnessed the event, but did nothing." (Doc. 11 at ¶ 29). Defendant Ward argues that he is entitled to summary judgment because no reasonable jury could find that he failed to protect her, as he had no knowledge of the incident. (Doc. 60).

When the incident began, Plaintiff was sitting on the bunk in her cell. (Doc. 61-1, Gregory Dep., pp. 98-99). Plaintiff testified that she yelled, C.O., C.O.!" *Id.* at p. 103. Plaintiff did not receive a response from any officer and admitted there was no indication that anyone heard her. *Id.* at p. 104. Plaintiff also admitted she did not know if Defendant Ward heard the inmate shouting at her. *Id.* at p. 107. Plaintiff testified that she moved to the wall where her cell door was located and pressed her back against the wall so she could not see the inmate and he could not see her. *Id.* at pp. 98-99. Plaintiff claims that the inmate stood at her door for approximately twenty minutes; however, she conceded she did not have a clock in her cell, and twenty minutes was her "best guess." *Id.* at pp. 105-106.

Plaintiff testified that officers checked on her about once per hour through the observation window. *Id.* at pp. 91-92. During the incident, Defendant Ward opened the observation window to check on Plaintiff. *Id.* at pp. 104-106. Plaintiff pointed to the cell door, but she did not say anything or request Ward's assistance. *Id.* at pp. 104-106, 172. Plaintiff conceded that when Defendant Ward looked into her cell through the observation window, he would not have been able to see the male inmate's penis or actions and would only have seen "shoulder movement a little bit." *Id.* at

pp. 175-176.  This is the only basis for Plaintiff's allegation that "at one point, [Ward] witnessed the event, but did nothing." (Doc. 11 at ¶ 29).

Here, the Court finds that there is no evidence Defendant Ward had actual knowledge of the male inmate masturbating outside her cell door prior to opening the observation window. *See Grieveson*, 538 F.3d at 776 (deliberate indifference requires that the officer had actual knowledge of the risk). There is no indication that Ward heard Plaintiff yell "C.O., C.O.!" or heard the other inmate shouting. Plaintiff also cannot establish that Defendant Ward knew she faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it after opening the observation window. When Ward opened the window, Plaintiff admitted that she simply pointed at the cell door and did not say anything. Due to the design of the cell, Ward would not have been able to see the male inmate's actions.

The Court finds Plaintiff has failed to establish that Defendant Ward was aware she faced of a specific, impending, and substantial threat to her safety when taking into consideration the layout and shape of Plaintiff's cell and her actions prior to and during the brief amount of time that Ward was able to see her through the observation window. Therefore, summary judgment in Ward's favor is appropriate.

**V.    Defendants were not deliberately indifferent to Plaintiff's serious mental health needs in violation of the Eighth Amendment.**

Plaintiff alleges that Defendants Bustos and Lape violated her Eighth Amendment rights when they were deliberately indifferent to her serious mental health needs. Defendants argue that they are entitled to summary judgment because Plaintiff received adequate mental health care.

Deliberate indifference to a prisoner's serious medical need violates the Eighth Amendment. *Snipes v DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 104 (1976)). A claim does not rise to the level of an Eighth Amendment violation, however,

26

unless the punishment is "deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable." *Antonella v. Sheehan*, 81 F.3d 1422, 1427 (7th Cir. 1996). A medical need is serious if a delay in treatment "exacerbated the injury or unnecessarily prolonged an inmate's pain." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (internal citations omitted). "To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind." *Petties v. Carter*, 836 F.3d 722, 729-30 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (internal citations omitted). The defendant must have actually known of and disregarded a substantial risk that the plaintiff would suffer harm. *Id*. This is a high bar "because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).

Mental health services at the RICJ are provided by the Robert Young Center (RYC), and medical care is provided by MEnD. If an inmate needs medical or mental health care, the inmate submits a request, which is sent directly to staff at MEnD or RYC for review. Plaintiff admits that she was seen by MEnD staff less than five days after arriving at the Jail, but she did not request treatment for her mental health conditions. Instead, Plaintiff decided to stop taking her psychiatric medications based on an assumption that this would automatically trigger a mental health exam.

According to Defendants, Plaintiff never asked for mental health care by submitting requests or grievances. Plaintiff claims that her placement in protective custody prevented her from accessing mental health care. (Doc. 68 at 15-16). She further argues that she mentioned mental health care in a list of grievances on November 24, 2020, and that this notified Defendants that she wanted mental health care. Neither of these arguments refute summary judgment on this issue.

First, there is no evidence that Plaintiff's housing placement in protective custody denied her access to mental health care or was based on her mental health conditions. Moreover, when Plaintiff complained to Defendant Lape about loneliness, Lape asked the RYC to reach out to her. The evidence shows that MEnD and Robert Young staff promptly provided treatment after being notified about her needs in August 2021.

The Court finds that Defendants were justified in believing that Plaintiff was receiving medical and mental health care and was in capable hands. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). "When detainees are under the care of medical experts, non-medical jail staff may generally trust the professional to provide appropriate medical attention." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). An exception exists where jail officials had reason to know that the medical staff was failing to treat or was inadequately treating an inmate. *Id.* Plaintiff does not allege, nor did she present any evidence, that Defendants had a reason to believe that she was not being treated or was inadequately treated.

To the extent that Plaintiff alleges she did not receive adequate care for her gender dysphoria, Plaintiff admitted that her hormone replacement therapy was continued the day after she arrived at the RICJ. Plaintiff is currently under review by the IDOC's transgender committee for a transfer to a women's facility and gender confirmation surgery. This Court will defer to the informed judgment of the medical staff. *See Konitzer v. Frank*, 711 F. Supp. 2d 874, 900 (E.D. Wis. 2010) ("[G]iven the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgement of prison officials as to the appropriate form of medical treatment.").

28

There is no evidence that Defendants Lape and Bustos acted with reckless disregard toward Plaintiff's serious medical or mental health needs. *See McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018). No reasonable jury would find that Defendants knew of and disregarded a substantial risk of harm. Therefore, summary judgment is granted in favor of Defendants Bustos and Lape.

## VI.   Defendants are entitled to qualified immunity.

Defendants Bustos, Lape, and Ward argue that they are entitled to qualified immunity on Plaintiff's constitutional claims. Qualified immunity "provides defendants immunity from suit, not just a defense to liability." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Even though qualified immunity "is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Id*. Qualified immunity shields a public official unless the plaintiff can demonstrate that (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Gerhartz v. Richert*, 779 F.3d 682, 688 (7th Cir. 2015).

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)). Qualified immunity cannot be defeated merely by "alleging [a] violation of extremely abstract rights" or by defining the right in question "at a high level of generality." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). Instead, "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019). The "crucial question" is whether the

official "acted reasonably in the particular circumstances that he or she faced." *Kemp*, 877 F.3d at 351.

To show that a right is "clearly established," the plaintiff must demonstrate that "closely analogous" caselaw or precedent finds the alleged violation unlawful. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). The plaintiff does not have to "point to an identical case, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *see also Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) ("The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'"). In rare cases, a plaintiff can show a right is clearly established without providing caselaw or precedent by "proving that the defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Reed*, 906 F.3d at 547.

Here, the cases Plaintiff identified in her Response merely liken discrimination based on transgender status to gender or sex discrimination. They do not establish that housing Plaintiff, a felon convicted of a highly publicized crime, in protective custody was unlawful, or that placing her in protective custody required notice and a hearing, or that jail officials should have known she needed mental health care. Taking the facts in the light most favorable to Plaintiff, there is no evidence that Defendants' conduct was so egregious that no reasonable official could have thought they were acting lawfully. *See Reed*, 906 F.3d at 547.

Likewise, Plaintiff has failed to establish that Defendant Ward violated a constitutional right and that the right was clearly established. Defendant Ward had only a brief interaction with Plaintiff when he opened the observation window to check on her on November 29, 2020. Plaintiff

admits she merely pointed at the window of her cell door and did not request assistance or even say anything. Plaintiff also concedes that when Defendant Ward looked in her cell from the observation window, he would not have seen the male inmate's penis or known he was masturbating.

Plaintiff has failed to show "'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would violate clearly established rights.'" *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (quoting *Smith v. Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)); *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999). Thus, Defendants Bustos, Lape, and Ward are entitled to qualified immunity.

## VII.    *Monell* claims

Plaintiff has not established an underlying constitutional violation necessary for a claim under *Monell* or presented any evidence of an official policy or widespread practice which would subject Defendant Sheriff Hart to official liability. *Monell  v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-92 (1978).

A plaintiff may hold a municipality responsible for constitutional torts committed by its employees only where "the tortfeasor inflicts a constitutional injury on the plaintiff in the execution of the government's policy or custom." *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014). For municipal liability under § 1983, the constitutional violation must be caused by one of the following: (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011).

Having found that Defendants did not violate Plaintiff's constitutional rights, summary judgment must also be granted in favor of Defendant Sheriff Hart on Plaintiff's official capacity claims. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (no *Monell* claim against the municipality permitted when plaintiff's constitutional rights have not been violated).

Moreover, Plaintiff has not presented any evidence of an express policy, custom, or widespread practice that violated her equal protection rights. Plaintiff identified some verbal comments made by five officers to support her allegations of harassment, but she admitted these incidents were not repeated. Isolated incidents are inadequate to demonstrate a widespread custom. Defendant Lape was the final decisionmaker regarding Plaintiff's housing assignment, but as the Court stated above, Plaintiff did not suffer a constitutional violation by being placed in protective custody. Therefore, Defendant Sheriff Hart is entitled to summary judgment in his official capacity.

### VIII.   Defendant Sheriff Hart is entitled to summary judgment on Plaintiff's ADA claim.

Plaintiff alleges that the Rock Island County Sheriff's Office violated her right to a reasonable accommodation under the ADA as it relates to her gender dysphoria because the RICJ refused to accommodate her requests to be placed in the female or male general populations. Defendants argue that Plaintiff is not a qualified individual with a disability because gender dysphoria is not considered a disability under the ADA, and Plaintiff failed to demonstrate that being placed in the general population was reasonable. (Doc. 63 at 21-22).

To establish a violation of the ADA, Plaintiff must show that (1) she is a qualified individual with a disability; (2) she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) the denial or discrimination was due to her disability. 42 U.S.C. § 12132; *Wagoner v. Lemmon,* 778 F.3d 586,

592 (7th Cir. 2015). "Discrimination under [the ADA] may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionately impacts disabled people." *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999).

"Evaluating the reasonableness of a particular accommodation in the prison context is particularly fact-intensive and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff." *Bilik v. Shearing*, No. 3:16-CV-821-NJR, 2020 WL 64626, at *10 (S.D. Ill. Jan. 7, 2020), *aff'd,* 860 F. App'x 435 (7th Cir. 2021). The Court can consider "security concerns, safety concerns, and administrative exigencies." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996)

Defendants argue that Plaintiff is not a qualified person with a disability because the ADA specifically exempts "gender identity disorders not resulting from physical impairments" from the definition of "disability." § 12211(b)(1). The issue remains unsettled in the Seventh Circuit, and there is significant disagreement among other courts regarding whether "gender dysphoria" is a protected disability under the ADA. *See Williams v. Kincaid*, 45 F.4th 759, 769-70 (4th Cir. 2022) (holding that gender dysphoria is not a "gender identity disorder," within meaning of ADA's protection exclusion for gender identity disorders not resulting from physical impairments); *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 753-54 (S.D. Ohio 2018) (gender dysphoria not resulting from physical impairment is within the ADA's exclusionary language); *Michaels v. Akal Sec., Inc.*, No. 09-CV-01300-ZLW-CBS, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010) (gender dysphoria is a gender identity disorder and therefore excluded); *but see Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123, at *3 (E.D. Pa. May 18, 2017) (gender dysphoria resulting in substantial limits on major life activities falls outside the ADA's

33

exclusionary language); *Doe v. Massachusetts Dep't of Correction*, No. CV 17-12255-RGS, 2018 WL 2994403, at *6 (D. Mass. June 14, 2018) (drawing a distinction between gender identity disorder and gender dysmorphia and suggesting that there may be a physical etiology underlying gender dysmorphia sufficient to take it out of "not resulting from physical impairments" category); *Venson v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 673371, at *2 (S.D. Ill. Feb. 22, 2021) (based on the "unsettled state of law," *pro se* prisoner was allowed to proceed with an ADA claim based on disability of gender dysphoria).

The Court need not determine whether gender dysphoria is a qualifying disability under the ADA because the undisputed material facts show that Defendants did not discriminate against Plaintiff by placing her in protective custody and declining to grant her requests to be housed in the general population. The undisputed material facts show that Plaintiff was placed in protective custody based on many other factors entirely unrelated to gender dysphoria. For instance, when making the determination to place her in protective custody, Defendant Lape considered Plaintiff's unique criminal history and convicted felon status, potential threats to Plaintiff's safety based on her crime and publicity surrounding the crime, the likelihood Plaintiff would be victimized by other inmates, Plaintiff's fears about being harassed or sexually assaulted by other inmates, maintaining order in the Jail, and limited staffing and housing options, especially due to the COVID-19 pandemic. (Doc. 61-3 at ¶ 20; Doc. 61-4 at ¶¶ 10, 24-25). Therefore, summary judgment is granted in favor of Defendant Sheriff Hart on Plaintiff's ADA claim.

## IX.   Defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

Plaintiff also brings a state law claim of intentional infliction of emotional distress (IIED) against Defendants Bustos, Lape, Ruark, O'Melia, Rollins, and Ward. Defendants argue that Plaintiff's state law claim should be rejected or relinquished to state court.

The "general rule" is that where all federal claims are dismissed before trial, a district court should relinquish jurisdiction over the pendent state law claims. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). However, district courts have the discretion to decide the merits of state law claims when appropriate and "otherwise efficient to do so." *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001) (citing *Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 704 (7th Cir. 1998)).

Here, Defendants' alleged actions fail to meet the standard of extreme and outrageous conduct necessary to establish IIED. "Under Illinois law, a plaintiff claiming intentional infliction of emotional distress must demonstrate that the defendant intentionally or recklessly engaged in 'extreme and outrageous conduct' that resulted in severe emotional distress." *Dent v. Nally*, No. 16-00442, 2016 WL 2865998, at *4 (S.D. Ill. May 17, 2016) (internal citations omitted). "[E]motional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006) (internal citations omitted). "Fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable." *Id.* at 1030. The emotional distress must be "so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity." *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988).

Plaintiff has identified only a handful of incidents, all involving one-time verbal comments by different correctional officers, occasional misgendering, and safe housing placement. None of these allegations include conduct that is so outrageous in character, or so extreme in degree, that it goes beyond the bounds of decency. Therefore, Defendants are also entitled to summary judgment on Plaintiff's IIED claim.

**IT IS THEREFORE ORDERED:**

(1)     Defendants' Motions for Summary Judgment [60], [63] are GRANTED. This action is DISMISSED WITH PREJUDICE. Plaintiff takes nothing. The parties will bear their own costs. The Clerk is directed to enter judgment and close this case.

(2)     If Plaintiff wishes to appeal this judgment, she must file a Notice of Appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

(3)     To proceed *in forma pauperis* on appeal, Plaintiff must file a Motion for Leave to Proceed on Appeal *in forma pauperis* and identify the issues she will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, she will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:  8/21/2023

s/ James E. Shadid
James E. Shadid
United States District Judge

36